UNITED STATES of America

v.

Lawrence G. HUTCHINS III, Sergeant (E–5), U.S. Marine Corps.

NMCCA 200800393.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 3 Aug. 2007.

22 April 2010.

For Appellant: Capt Jeffrey Liebenguth, USMC; Capt S. Kaza, USMCR.

For Appellee: Capt Mark Balfantz, USMC; Brian Keller.

GEISER, S.J., delivered the opinion of the court in which REISMEIER, C.J., MITCHELL and CARBERRY, S.JJ., and PERLAK, J., concur. MAKSYM, S.J., filed a concurring opinion joined by BEAL, J. BOOKER, S.J., filed an opinion concurring in the result. PRICE, J., filed an opinion concurring in part and dissenting in part.

## PUBLISHED OPINION OF THE COURT

GEISER, Senior Judge:

A general court-martial with enlisted representation convicted the appellant, contrary to his pleas, of conspiracy, making a false official statement, unpremeditated murder, and larceny, in violation of Articles 81, 107, 118, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 918, and 921. The approved sentence was for reduction to pay grade E–1, confinement for 11 years, and a dishonorable discharge.

The appellant raised three assignments of error.[1] After reviewing the record and considering the parties' pleadings, this court specified two additional issues and requested briefing by the parties.[2] On 20 May 2009, after supplemental briefing by the parties, this court ordered a *DuBay*[3] hearing into the court's first specified issue involving the appellant's representation by Captain (Capt) Bass. The ordered *DuBay* hearing was conducted 18–20 August 2009. This court received the authenticated record of the hearing, to include the military judge's Findings of Fact and Conclusions of Law, on 5 November 2009. The parties were provided time to submit additional briefs.

We have considered the record of trial, the various pleadings of the parties, and the record of the *DuBay* hearing. For the reasons cited below, we conclude that the military judge erred when he permitted proceedings to continue after Capt Bass ceased representation of the appellant without either the appellant's knowing release or a finding of good cause by the military judge. Under the specific facts of this case, we find that any attempt to assess specific prejudice arising from Capt Bass' unauthorized departure would be speculative. We will, therefore, presume prejudice. We do not reach the issue of whether another set of facts and circumstances would permit a non-speculative assessment of prejudice. We will set aside the findings and sentence in our decretal paragraph and return the record to the Judge Advocate General with a rehearing authorized. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Background

The appellant was charged and found guilty, *inter alia*, of conspiring with Marines in his squad to kidnap and murder an Iraqi man in Hamdaniyah, Iraq, in April 2006. The appellant was also charged and found guilty, along with several of his squad members, of carrying out the murder on 26 April 2006.

### Assignment of Counsel

In June 2006, pursuant to the convening authority's standing policy of detailing two

---

1. I. WHETHER THE MILITARY JUDGE ERRED WHEN HE REFUSED TO INSTRUCT THE MEMBERS THAT THEY COULD CONSIDER THE IMPACT OF THE OPERATIONAL ENVIRONMENT ON THE APPELLANT'S STATE OF MIND AND PERCEPTIONS FOR THE CHARGE OF VOLUNTARY MANSLAUGHTER, WHERE APPELLANT WAS SUFFERING FROM POST–TRAUMATIC STRESS DISORDER, ACUTE SLEEP DEPRIVATION, WAS IN A STATE OF CONSTANT PROVOCATION, AND HIS CHAIN OF COMMAND CREATED A CLIMATE OF ACCEPTANCE TOWARDS VIGILANTISM AND ABUSE OF SUSPECTED INSURGENTS.
II. WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED THE DEFENSE CHALLENGE FOR CAUSE AGAINST A MEMBER WHO HAD BEEN IN CHARGE OF PREDEPLOYMENT URBAN WARFARE TRAINING FOR THE APPELLANT AND HIS ALLEGED CO–CONSPIRATORS, WHERE THE QUESTION OF APPROPRIATE TACTICS IN URBAN WARFARE WAS AN ESSENTIAL ISSUE AT TRIAL.
III. WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED THE DEFENSE MOTION TO SUPPRESS THE APPELLANT'S CONFESSION, WHERE THE APPELLANT HAD PREVIOUSLY TERMINATED AN INTERROGATION AND REQUESTED THE ASSISTANCE OF COUNSEL, BUT WAS INSTEAD KEPT IN SOLITARY CONFINEMENT FOR SEVEN DAYS WITHOUT ACCESS TO COUNSEL AND THEN RE–INTERROGATED.

2. IV. WAS THE APPELLANT'S RELEASE OF CAPTAIN BASS FROM FURTHER REPRESENTATION VALID, AND IF NOT, DID GOOD CAUSE EXIST FOR TERMINATING THE ATTORNEY–CLIENT RELATIONSHIP IN THE ABSENCE OF RELEASE? IF A VALID RELEASE OR GOOD CAUSE DOES NOT EXIST, WHAT IS THE PREJUDICE TO APPELLANT?
V. DID THE MILITARY JUDGE ERR BY CONDUCTING A CLOSED SESSION OF COURT WHEN THE GOVERNMENT HAD NOT ASSERTED A CLAIM OF PRIVILEGE PURSUANT TO MIL. R. EVID. 505? IF SO, WHAT IS THE PREJUDICE TO THE APPELLANT?

3. *United States v. DuBay*, 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967).

trial defense counsel for all courts-martial involving a murder charge arising from this incident,[4] the appellant was detailed Capt G. Bass, USMC, and Lieutenant Colonel (LtCol) Smith, USMC.[5] The appellant was ultimately arraigned on 7 December 2006. After the initial session of court, trial proceeded on 27–28 February 2007, 26 March 2007, 11–13 June 2007, 11–12, 23–27, 30–31 July 2007, and concluded on 1–3 August 2007. Capt Bass did not represent the appellant after 25 May 2007 when he began a terminal leave period. Record at 454. His terminal leave ended upon his release from active duty on 1 July 2007.

Prior to the 11 June 2007 session of court, Capt Bass had not been properly released from representing the appellant. At an Article 39(a) session the following discussion occurred:

> MJ: ... Captain Bass is currently not present. I have been informed by counsel that he arrived at his Expiration of Active Service in the Marine Corps, and has been discharged from the Marine Corps and has been relieved as detailed defense counsel in this case; and has been replaced by Lieutenant Colonel Cosgrove.
>
> . . . .
>
> ADC: Yes, sir. Captain Bass reached the end of his obligated service. He has been relieved of representation of Sergeant Hutchins.

Record at 449. The military judge then asked Trial Defense Counsel (TDC) when Capt Bass left active duty. The remaining detailed counsel indicated that he was "not sure of the exact date, Your Honor. I know that he was—executed orders to—on terminal leave some time around the—before the Memorial Day holiday. I know that, sir. Some time probably around the 25th of May;

that could be off a few days one way or the other." *Id.* at 454.[6]

The Military judge then explained to the appellant that the he had:

> MJ: ... the right to [be represented by] all of your detailed defense counsel including Captain Bass; however, once Captain Bass leaves active duty, there's no way that the Marine Corps can keep him on as your detailed defense counsel. Do you understand that?
>
> ACC: Yes, I do, sir.
>
> MJ: Have you discussed this issue with [your civilian defense counsel] and Lieutenant Colonel Smith?
>
> ACC: In detail, sir.
>
> MJ: Okay. Do you have any objection to proceeding at this point?
>
> ACC: No, I do not, sir.

*Id.* at 454–55.

After the initial pleadings were submitted to this court, we concluded that a post-trial hearing into the facts and circumstances involved in the apparent severance of the attorney-client relationship between the appellant and Capt Bass was warranted. A *DuBay* hearing was ordered, at which the presiding military judge heard the testimony of Capt Bass, his co-counsel, and the (Regional Defense Counsel) (RDC) associated with the case. The military judge made written findings of fact and conclusions of law,[7] and authenticated the record. The following findings of fact contained in Appellate Exhibit CL are supported by the record and we adopt them as our own.

> "Captain Bass was detailed on 13 July 2006." AE CL at 2–3, *DuBay* Hearing Record.
>
> "On 31 Aug 2006 ... Captain Bass tendered a request to resign his commission

---

4. Declaration of Regional Defense Counsel of 17 March 2009 at 2, filed on 18 March 2009 with Appellant's Consent Motion to Attach, which Motion was granted on 27 March 2009; Record at 453.

5. The appellant also hired a civilian counsel.

6. The Government characterizes the TDC's vague and unsure response as clarification for the mili-

tary's judge's misconception that Capt Bass was already at the end of his obligated service. Government's Answer to Supplemental Brief of 16 Apr 2009 at 5. However, when read in context of what the military judge said immediately thereafter to the appellant, we do not share the same view of the import of the TDC's response.

7. Appellate Exhibit CL, *DuBay* Hearing Record.

for an effective date of 1 July 2007. The request was approved." *Id.* at 5.

"The initial trial dates that had been ordered were before Captain Bass was approved to leave active duty; however, the defense team moved for, and was granted, a continuance of trial dates until July 2007—beyond Captain Bass' approved date to leave active duty." *Id.*

"In the second defense continuance request, the defense team articulated Captain Bass' departure from active duty as one of the bases to justify the request." *Id.*

"Although Captain Bass had submitted his resignation request in August 2006, he did not inform the appellant that he would be leaving active duty until early May 2007." *Id.* at 6.

"After this early May 2007 meeting between Captain Bass and the appellant, the appellant never saw Captain Bass again." *Id.*

"The appellant was never advised that he could request that Captain Bass be extended on active duty to complete the appellant's trial." *Id.*

"The appellant never signed a document releasing Captain Bass from active duty." *Id.*

"Captain Bass never 'requested' that the appellant release him as his counsel; instead, Captain Bass presented the situation to the appellant as one in which there was no other option to remain on active duty." *Id.*

"During an 11 June 2007 Article 39a, UCMJ session, the military judge informed the appellant that because Captain Bass would be leaving active duty, there was no way the Marine Corps could keep him on the defense team." *Id.* at 7.

"The appellant told the military judge that, after having consulted with [his remaining counsel] about this issue, he had no objection to proceeding without Captain Bass." *Id.*

**8.** Capt Bass testified that he believed his terminal leave began on 25 May 2007. *DuBay* Hearing

We do not adopt that portion of the *DuBay* judge's finding that indicates "Captain Bass never ... informed the court that he was leaving the Marine Corps." *Id.* at 7. This finding is inconsistent with AE XLIV, which documents that the court was made aware of Capt Bass' pending separation from active duty no later than 18 May 2007.

We accept and adopt the *DuBay* judge's additional findings that:

"[T]he appellant was never informed of the possibility of objection to Captain Bass leaving the case." AE CL at 8.

"Captain Bass commenced terminal leave in May 2007 and left Southern California."[8] *Id.*

"Captain Bass met with Lieutenant Colonel Vokey, the Regional Defense Counsel, in May 2007 regarding Captain Bass' imminent departure from active duty. Lieutenant Colonel Vokey ... had first hand knowledge of some judge advocates having had requested extensions to their EASs to complete representation of their clients as well as other judge advocates who had been denied terminal leave so they could finish representation of their clients." *Id.* at 11.

The *DuBay* hearing military judge concluded that the remaining trial defense counsel, LtCol Smith, and the civilian counsel "were operating under the mistaken belief that no other option existed to extend Captain Bass' EAS. The Regional Defense Counsel, Lieutenant Colonel Vokey, was not laboring under this false impression; nevertheless, he never provided contrary advice to Captain Bass or the rest of the defense team." *Id.* at 15.

We note the following additional pertinent facts from the record.

1) Capt Bass was assigned to the Hutchins case by the RDC, but reported to the Commanding Officer, Headquarters & Headquarters Squadron, MCAS Miramar for operational and administrative purposes. AE CXXXIX at 2–3, *DuBay* Hearing Record.

Record at 2088, 2151.

2) Capt Bass's terminal leave date was approved by Marine Corps personnel outside of the RDC chain-of-command. *Id.* at 3.

3) On 12 March 2007 the trial defense requested a continuance of the trial date. They requested a motions hearing date of 11–12 June 2007 and a trial date of 16–27 July 2007. AE XXV.

4) On 26 March 2007, with no objection from Government counsel, the military judge approved the request. Record at 416.

5) On 18 May 2007 the defense requested another continuance and served the request upon the court and Government counsel on the same day. AE XLIV.

6) The defense indicated that one of the reasons for the request was that Capt Bass would be separating from active duty on 1 July 2007 and it would require additional time adequately prepare his replacement counsel. *Id.* at 3.

7) On 24 May 2007 Government Counsel filed its response with the court. AE XLV.

8) The Government counsel did not oppose a continuance for up to 10 days. The Government opposed a continuance greater than 10 days. *Id.* at 4.

9) As part of its rationale, the Government noted that during the session of court involving the first continuance request the defense did not inform the court that they were requesting the military judge to "set this case for trial beyond Capt Bass' EAS." *Id.* at 2.

10) On 11 June 2007, the court addressed the continuance motion on the record. Record at 460.

11) On 11 June 2007, Capt Bass was absent from court. *Id.* at 449.

12) On 11 June 2007 the military judge misinformed the appellant regarding Capt Bass' then-current active duty status. *Id.* at 454–55.

13) On 11 June 2007, the military judge misinformed the appellant regarding the appellant's option to effectively ob-ject to Capt Bass' pending departure. Specifically, the military judge further misled the appellant by misinforming him that there was nothing the United States Marine Corps could do to effectuate continued representation by Capt Bass. *Id.*

14) On 13 June 2007, the military judge noted that the defense and the Government had reached an agreement regarding the continuance request. *Id.* 716–17.

15) The Government agreed to begin trial on 24 July 2007. *Id.*

We agree with the *DuBay* Hearing judge's legal conclusion that the military judge effectively severed the attorney-client relationship between Capt Bass and the appellant. AE CL at 7–8. We do not, however, agree that the severance was for good cause. *Id.* at 8.

■ "The right to effective assistance of counsel and *to the continuation of an established attorney-client relationship is fundamental* in the military justice system." *United States v. Baca,* 27 M.J. 110, 118 (C.M.A.1988)(emphasis added)(citing *United States v. Palenius,* 2 M.J. 86 (C.M.A.1977)). Whether an established attorney-client relationship is properly severed is a question of law which we review *de novo. United States v. Allred,* 50 M.J. 795, 799 (N.M.Ct.Crim. App.1999).

All trial participants, including the military judge, were apparently mutually confused regarding Capt Bass' active duty status, the appellant's option to effectively object to Capt Bass' departure from active duty, and what factors constitute good cause for a military judge to sever an existing attorney-client relationship in an ongoing trial without the consent of the client.

■ We reject the Government's contention that the appellant voluntarily consented to the severance of his attorney-client relationship with Capt Bass. To hold that the appellant's apparent acquiescence to a muddled situation described to him by his own legal counsel and the military judge as a *fait accompli,* beyond anyone's control, would require us to impart a higher degree of knowledge of the law and facts to the appellant

than that which was collectively shared by multiple seasoned lawyers. This we will not do. In the present case, the appellant's statement that he had no objection to proceeding forward was not made with knowledge of the true facts or law. The military judge's reference to the appellant's "right" to be represented by all his detailed counsel was, in the factual context presented at trial, at best an illusory right and amounted to the appellant having no option but to agree.

The Uniform Code of Military Justice provides an accused with rights to counsel that exceed Constitutional standards. The President has gone further to require—in very direct and extraordinary terms not found elsewhere in the Manual for Courts–Martial—that release of a defense counsel in situations such as this occur only with the approval of the military judge for good cause, or with the "express consent" of the accused. Given the elevated treatment this right to counsel has been given by both Congress and the President, appellant's uninformed acquiescence to Capt Bass' departure is best interpreted under these facts as a constructive objection to the loss of this right.

The question remains whether termination of Capt Bass' attorney-client relationship with the appellant was severed by the military judge, without the appellant's consent, for good cause. We begin by noting that the military judge's action to effectively sever the appellant's relationship with Capt Bass was flawed both factually and legally. As noted above, the military judge was apparently operating under the misapprehension or at least confusion regarding whether Capt Bass was on terminal leave or had already been released from active duty. He failed to properly determine the actual facts. Further, the military judge apparently believed that departure from active duty constituted good cause for severing an attorney-client relationship during an ongoing trial. We disagree.

■ In the absence of the accused's consent or an approved application for withdrawal by the defense counsel, severance of the relationship can only be proper when good cause is shown on the record. *Allred,* 50 M.J. at 799–800. Convenience of the Government is not a sufficient basis to establish good cause, *Id.* at 800 (citing *United States v. Murray,* 42 C.M.R. 253, 254 (C.M.A.1970)). Good cause must be based on a "truly extraordinary circumstance rendering virtually impossible the continuation of the established relationship." *United States v. Iverson,* 5 M.J. 440, 442–43 (C.M.A.1978)(footnote omitted).

■ No good cause existed to sever the attorney-client relationship in the instant case. We find the Government's reliance on *Allred* and Manual of the Judge Advocate General, JAGINST 5800.7E § 0131 (20 Jun 2007) (JAGMAN) to be misplaced. In the latter instance, the Government acknowledges that the JAGMAN provision deals with denying an Individual Military Counsel (IMC) request for a counsel who has not yet been detailed to function as a trial defense attorney for a particular court-martial and does not directly address the scenario of an existing attorney-client relationship during the pendency of an ongoing general court-martial. Government's Answer of 16 Apr 09 at 16.

In *Allred,* a Marine facing various court-martial charges was detailed a trial defense counsel. For reasons not germane to this analysis, the charges were withdrawn and identical charges were re-referred to a new court-martial some two months later. Allred was detailed a different trial defense counsel in connection with the re-referred charges. He submitted an IMC request for his original defense counsel. The request was denied by the detailing authority. The court held that withdrawal of charges does not sever an existing attorney-client relationship regarding the charged offenses. An IMC request for a particular attorney with whom an accused enjoys an existing attorney-client relationship may only be denied for good cause. The court went on to opine that, in the context of an IMC request, good cause was satisfied by a situation such as "requested counsel's release from active duty or terminal leave." *Allred,* 50 M.J. at 801.

"Good cause" is defined to include, "physical disability, military exigency, and other extraordinary circumstances which render the ... counsel ... unable to proceed with

the court-martial within a reasonable time. 'Good cause' does not include temporary inconveniences which are incident to normal conditions of military life." RULE FOR COURTS-MARTIAL 505(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.).[9] *See also United States v. Morgan*, 62 M.J. 631 (N.M.Ct.Crim.App.2006)(finding error in the severance of the trial defense counsel from taking part in the post-trial processing due to counsel's change of commands). We distinguish *Allred* based on the underlying context of the severance.

Unlike an IMC request made at an early stage of the case, in the instant case the trial was underway and Capt Bass had participated in nearly a year of defense consultation and planning efforts. He had actively participated in the ongoing development of trial strategy, contributed to the decision-making process which defined the anticipated contribution of each counsel, and earned the appellant's trust. This is fundamentally different from the IMC context in which the requested attorney has, as yet, played no role in an ongoing defense strategy and planning process. *See United States v. Spriggs*, 52 M.J. 235, 246 (C.A.A.F.2000)(criteria used by the court to determine if a reservist may be involuntarily recalled to serve as counsel included consideration, *inter alia*, of whether the attorney accomplished substantial trial preparation.)

Thus, "good cause" must be assessed on a sliding scale which considers the contextual impact of the severance on the client. Severance of an attorney/client relationship early in a case will have significantly less impact on an accused's representation rights than severance after work has been done on the defense case. A severance on the eve of trial after nearly a year of defense strategizing and preparation has even greater impact. Good cause in the context of an IMC request early in a trial cannot, therefore, be broadly applied to all severance cases as the Govern-

ment urges. Excusal for good cause by the military judge should, as the Court of Appeals for the Armed Forces (C.A.A.F.) stated, be authorized only in cases where there exists "truly extraordinary circumstance[s] rendering virtually impossible the continuation of the established relationship." *Iverson*, 5 M.J. at 442–43.

In the instant case there existed no truly extraordinary circumstance which rendered impossible the continuation of the long-established relationship between the appellant and Capt Bass. Certainly this was true during the period prior to 1 July 2007, when Capt Bass was on terminal leave. Terminal leave and an attorney's end of active service is a normal occurrence of military life that can be planned for. EAS, standing alone, cannot be used as a basis to sever an existing attorney-client relationship in this case after nearly a year of preparatory work and mere weeks before commencement of a general court-martial for murder.

Assuming, *arguendo*, that this court does not find good cause for severance, the Government urges us to find that the defense counsel, not the Government severed the attorney-client relationship. At the *DuBay* hearing, the Government argued that trial defense counsel had not requested an extension of his service, nor informed the Government counsel or military judge of his pending departure. We take issue with the latter assertion. The record clearly demonstrates that the Government counsel and the military judge were both made aware of Capt Bass' EAS no later than 24 May 2007. They were also aware that the pending trial date was after Capt Bass' EAS.

The multiple errors and inattention leading to deprivation of counsel in this case reflect something of a perfect storm. The initial errors arose in the defense team and with Capt Bass in particular.[10] The record and the *DuBay* hearing reflect that the defense team as a whole, and Capt Bass in particular,

---

9. While this standard is actually applicable to excusal for good cause by the authority who detailed the counsel to the case, and the proper standard for good cause excusal is the R.C.M. 506 standard as explained in *Iverson, infra,* our conclusion is the same under either standard of good cause.

10. We leave the ethical implications of Capt Bass' conduct to his state bar authority and the Navy Rules Counsel.

consistently failed to provide the appellant with proper legal advice regarding the appellant's very real option to actively contest Capt Bass' pending departure from active duty and from the defense team.

The military judge's approach compounded the defense team's errors by cementing and validating the appellant's misperception of his rights and options. The military judge had a statutory responsibility to ensure compliance with the representational severance rules in R.C.M. 506(c), or, if necessary, to abate proceedings until the appellant's right to continue an ongoing attorney/client relationship had been formally adjudicated under this rule.

On three separate occasions, the military judge, faced with a proceeding in which one of the defense counsel was not present, informed the appellant that he had the absolute right to the presence of his counsel. Record at 269–70, 415–16, 722. With that context, the military judge's statement suggesting that the appellant was faced with a *fait accompli* provided a judicial imprimatur to the appellant's misunderstanding that there was no way for appellant to effectively object to Capt Bass' departure. The military judge's failure arose directly from his failure to formally carry out his responsibilities under R.C.M. 506(c).

The ambiguous facts surrounding Capt Bass' departure and his actual duty status, plus the military judge's unclear explanation of the appellant's legal rights to have all of his counsel present, should have prompted a vigilant Government counsel to ameliorate this situation by requesting the military judge to affirmatively determine the status of Capt Bass and appellant's desire for representation irrespective of Capt Bass' pending release from active duty. In this regard, we observe that this issue may have been avoided altogether had Capt Bass' supervisory defense attorney, or his Officer in Charge at Miramar, or the Officer in Charge of LSSS at Camp Pendleton, formally confirmed that the appellant had properly released Capt Bass, or that the military judge had made a good cause ruling before they allowed Capt Bass to commence terminal leave or be separated from the Marine Corps. At any point

prior to 1 July 2007, any one of these officers could have initiated steps to recall Capt Bass from terminal leave and/or delay execution of his release from active duty.

■ With regard to a showing of prejudice, this is a case of first impression. The case law suggests two possible paths depending on who was at fault for the deprivation. In cases involving severance of an existing attorney/client relationship by someone other than the appellant or the defense team, C.A.A.F. has consistently opined that, due to the unique nature of defense counsel, appellate courts will not engage in "nice calculations as to the existence of prejudice"... but will instead presume prejudice. *Baca*, 27 M.J. at 119; *see also United States v. Schreck*, 10 M.J. 226, 229 (C.M.A.1981); *Allred*, 50 M.J. at 801. Our court has more recently held that it will not undertake a prejudice analysis when an existing attorney-client relationship was improperly severed, and will instead find that improper severance requires reversal. *United States v. Dickinson*, 65 M.J. 562, 566 (N.M.Ct.Crim.App. 2006); *see also Iverson*, 5 M.J. at 444 (setting aside that portion of the court-martial that the trial defense counsel who was improperly severed was not able to participate in without inquiring into the existence of prejudice).

The second path is reflected in cases involving improper abandonment of a client by a defense attorney or which involve a client validation of a severance at some point before or after the severance. Such cases have conducted a prejudice analysis and examined the facts and circumstances surrounding the severance/abandonment. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Acton*, 38 M.J. 330 (C.M.A.1993); *United States v. Kelly*, 16 M.J. 244 (C.M.A.1983). Thus, we are faced with a hybrid situation involving error both within and without the defense team.

Based on the record, it appears that Capt Bass departed with no turnover with either his "relief" or the remaining counsel—a mere five to six weeks before commencement of this murder trial. There is no evidence that Capt Bass made any attempt to integrate his prior work into the activities of the remain-

ing attorneys. Unfortunately, we do not know, and we cannot know, the actual real-world impact of Capt Bass' departure from the defense team.

We believe the dissent's prejudice analysis consideration of the adequacy of the remaining defense counsel is mistaken. A right to the continuation of an existing attorney-client relationship is illusory if it can be disregarded without an accused's consent for any but the most compelling reasons. It is of little moment whether the remaining defense counsel provided good, poor, or indifferent representation. At issue is what, if anything, Capt Bass would have added to the mix.

Without speculating, we know from the *DuBay* hearing that Capt Bass was developing a theory of post-traumatic stress disorder (PTSD) with an expert consultant. We also know that this consultant was ultimately dismissed by the civilian counsel in favor of an expert with arguably less impressive credentials. Had the PTSD theory been further refined, we have no way of knowing whether the appellant might have elected to testify during the trial on the merits before the members. We cannot know if the appellant would, in that circumstance, have struck an empathetic chord in them. Further, we have no way to assess whether the appellant's evidence and his appearance might have been considered, as well, during sentencing. Had Capt Bass stayed with the case, it is impossible to determine whether the appellant might have testified during the sentencing proceedings rather than present an unsworn statement. Although an unsworn statement was certainly an authorized means of presenting the appellant's version of extenuating and mitigating evidence, the difference in impact is another unknowable factor. Because we do not and cannot know these things, we can never rationally assess the actual impact of Capt Bass' departure.

Under the facts and circumstances of this case, we are persuaded that any attempt to assess prejudice would be speculative. In view of the significant involvement of parties outside the defense team to the appellant's loss of Capt Bass' services, we place the burden of proof on the Government and will, therefore, presume prejudice. We note, however, that our determination to presume prejudice is very fact specific. Another case with other facts might well be more amenable to a reasoned prejudice analysis.

We are convinced that the military judge and counsel were at all times acting with the best of intentions based on a misunderstanding of the facts and law. The fact that no one person or entity was entirely responsible for the inappropriate severance of the attorney-client relationship in this case does not alter the fact that a wrongful severance occurred.[11]

### Conclusion

The findings and approved sentence are set aside. The record is returned to the Judge Advocate General of the Navy for remand to an appropriate convening authority who may order a rehearing. In view of our action, the remaining assignments of error are now moot.

Chief Judge REISMEIER, Senior Judges MITCHELL and CARBERRY, and Judge PERLAK concur.

MAKSYM, Senior Judge (concurring):

I associate myself entirely with the opinion authored by Senior Judge Geiser. I write separately in view of the abdication of professional responsibility in this case by the detailed defense counsel, Captain Bass, who seemingly abandoned his client just weeks before the commencement of a murder trial. That this act of abandonment was given the imprimatur of de facto judicial assent by the trial judge is particularly disconcerting and constitutes the type of conduct we will not countenance.

Rule 1.16 of the Rules of Professional Conduct governing attorneys practicing under the cognizance of the Judge Advocate General of the Navy (Judge Advocate General Instruction 5803.1C (9 Nov 2004)) sets forth the conditions under which a judge advocate can

---

11. We note that appending to the record a release of counsel signed by an accused or special findings of the military judge regarding good cause to document compliance with R.C.M. 506(c) is a prudent practice.

terminate the privileged state he/she enjoys with a client. The rule states in part:

b. Except as stated in paragraph c, a covered attorney may seek to withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

(1) the client persists in a course of action involving the covered attorney's services that the covered attorney reasonably believes is criminal or fraudulent;

(2) the client has used the covered attorney's services to perpetrate a crime or fraud;

(3) the client insists upon pursuing an objective that the covered attorney considers repugnant or imprudent;

(4) in the case of covered non-USG attorneys, the representation will result in an unreasonable financial burden on the attorney or has been rendered unreasonably difficult by the client; or

(5) other good cause for withdrawal exists.

The comment section of this rule also reflects that "[a] covered attorney should not represent a client in a matter unless the covered attorney can perform competently, promptly, without improper conflict of interests, and to completion."

In the case at bar, Captain Bass never made application to the court for leave to withdraw, or sought release from his client, who was facing confinement for the remainder of his natural life if convicted. *See* RULE FOR COURTS-MARTIAL 505(d)(2)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.) and R.C.M. 506(c). The time line of Captain Bass' participation in this matter has been soundly outlined within the majority opinion. However, it bears emphasizing that the detailed defense counsel were assigned to this very serious case on 13 July 2006. Trial was ultimately held from 1–3 August 2007. Just two weeks after his assignment to the case, Captain Bass tendered his resignation, which was, after winding its way through the administrative chain of command, granted in due course, with an effective date of 1 July 2007. It is only by virtue of a reference within the 18 May 2007 defense continuance

motion that the military judge was constructively informed that one of Sergeant Hutchins' attorneys was intending to leave active duty prior to the trial. Upon receipt of this pleading, the prayer for which was subsequently granted, the military judge failed to initiate action regarding the still unauthorized prospective withdrawal of counsel.

A review of Captain Bass' performance, namely his failure to file pleadings with the court below in which he either sought leave to withdraw for good cause or, in the alternative, indicated that he had obtained express permission from his client to withdraw, seemingly stands in violation of the rules governing covered attorneys practicing under the cognizance of the Judge Advocate General of the Navy. That an attorney would place his personal ambitions or desires ahead of his/her client's interests in any case would constitute a grave breach of his fundamental obligation to his client. The fact that this clear breach of professional responsibility took place within the ambit of a high-profile murder case only compounds the injury done to the statutorily-protected institution that is the attorney-client relationship. I therefore believe it is appropriate for this court to call upon the Judge Advocate General to initiate such ethical review as he thinks necessary through the Rules Counsel to determine what, if any, administrative action should be taken relative to this attorney. Of course, Captain Bass does not stand alone in failing to approach the trial court. The record is clear that no member of the defense team acted until the eleventh hour of this litigation. Unfortunately, the record is also clear that no one in a supervisory position ever acted to ensure Captain Bass' actions were in keeping with the standards required of judge advocates seeking to withdraw from active representation in a criminal case.

Inaction by the trial judge exacerbated the impact of Captain Bass' failure in respect to the representation of his client. As set forth in full within the majority opinion, rather than immediately addressing the issue of pending withdrawal after coming into possession of the continuance request that obliquely referenced it, the judge waited until a subsequent Article 39a hearing nearly three weeks

later and treated the disappearance of Captain Bass as nothing more than a fait accompli. Clearly, Judge Meeks could have compelled Captain Bass' appearance for purposes of addressing this critical matter—even to the point of ordering an abatement of proceedings to ensure that the consular rights of the appellant were safeguarded. As the majority opinion reveals, he failed to do so.

Courts-martial possess all the powers inherent in any court to regulate the practical methods of conducting their business and hearing cases. *See Rencher v. Anderson,* 93 N.C. 105, 107 (1885); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)(citing *United States v. Hudson,* 7 Cranch 32, 11 U.S. 32, 3 L.Ed. 259 (1812)). This long-standing doctrine of inherent authority, as supplemented by R.C.M. 801, has equipped military judges with the means by which to enforce their judicial will in an effort to properly execute their all-important function. *See United States v. Gore,* 60 M.J. 178, 186 (C.A.A.F.2004) (citations omitted). The trial judge, armed with his actual and inherent powers, is the gatekeeper of justice. He must never abdicate his oversight responsibilities by adopting, de facto, the illegitimate acts of counsel, as in the case at bar.

Navy and Marine Corps judge advocates are required to comport their behavior to ethical requirements without regard to grade or experience. An association of attorneys that fails to hold even its most junior members professionally accountable loses public confidence. Similarly, supervisory judge advocates are charged with overseeing subordinate compliance with professional responsibility rules and taking reasonable remedial action when aware of conduct that does not meet those standards. JAGINST 5803.1C at Rule 5.1. Likewise, Navy and Marine Corps judges have been endowed with the responsibility for the application of justice and, uniquely, the professional growth of the uniformed attorney's appearing before them. They are the last line of defense against the kind of ill-considered conduct that occurred during this case.

This case serves as a grave exemplar of what can happen when an attorney fails to recall the obligation he owes to his client and to the military justice system, and where a supervisory judge advocate fails to recognize and remediate deviation from that obligation. It underscores the requirement for judges to remain active in safeguarding the interests of all parties, especially the constitutionally-mandated rights of those who are placed before them for judgment. What happened here is unacceptable.

Judge BEAL joining this opinion.

BOOKER, Senior Judge (concurring in the result):

I concur in the judgment of the court, but for slightly different reasons from those stated in the lead opinion. Accordingly, I respectfully file this separate opinion.

I would characterize the error in this case as structural. If an error is characterized as "structural," it is an error that so infects the regularity of the proceedings that it cannot be tested for prejudice. *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In a limited number of cases, the structural error is one where harmlessness is irrelevant. *See McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In either case, the error will dictate a reversal of the decision at the trial level. *See Sullivan v. Louisiana,* 508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

The error that I see, moreover, is the denial of the opportunity to have Captain (Capt) Bass properly released from representation under RULE FOR COURTS-MARTIAL 505, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.). R.C.M. 505 sets out specific procedures to follow when an attorney-client relationship in an active case must be terminated. I cannot tell from this record whether those procedures were followed, and, like the majority, I cannot tell what impact Capt Bass's departure had on the trial of this case.

Comings and goings are facts of military life. It is not unreasonable to suspect that a noncommissioned officer of Marines would have served under a number of commanding and executive officers during his career,

would have had multiple primary care managers assigned to him, and would have had more than one chaplain for pastoral care. It would not be unreasonable to suspect, then, that when the appellant was told that his detailed defense counsel was leaving active duty, the appellant would have assumed that attorneys are no different from any other professional, especially if his remaining attorneys had not correctly explained why that is not in fact the case. The military judge could have explained to the appellant the difference between waiving counsel for a particular session of the court and severing all ties with the counsel. The counsel's understanding of the length of his service could have been ascertained. The military judge could have ensured continued representation during the post-trial process until the proper relief occurred under Article 70, UCMJ, 10 U.S.C. § 870. My great frustration in this case is the lack of a factual record of the events culminating in the appellant's apparent resignation to the absence of Capt Bass from the trial.

Had this matter been properly litigated and preserved, it would have been possible for the appellant to seek immediate relief from our court in the nature of a writ of mandamus to require Capt Bass to continue on the case until its completion. We might or might not have granted the requested relief, but we would not be faced now, after findings and sentence had been announced and the sentence at least partially executed, with the task of picking apart the workings of the defense team in presentation of the case using the cleaver, not the scalpel, of the *DuBay*[1] hearing.

I point out that the relevant concern is as follows: "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan,* 508 U.S. at 279, 113 S.Ct. 2078. This phrasing of the test clearly places the burden of demonstrating the effect of the error on the Government, and as the majority notes, the Government has failed to dispel the concern.

I would therefore conclude that structural error occurred in this case and would set aside the findings and sentence. Recognizing that structural errors are rare and that there is a strong presumption that an error is not structural, *e.g., United States v. Brooks,* 66 M.J. 221, 224 (C.A.A.F.2008)(citing *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)), nonetheless the denial of military due process that the appellant suffered in this case casts doubt, in my mind, on the fairness and regularity of the proceedings.

PRICE, Judge (concurring in part, dissenting in part):

I concur in the court's decision to set aside the sentence, but respectfully dissent from that portion of the opinion setting aside the findings.

Assuming that the appellant was improperly deprived of the full exercise of his statutory right to continuation of an established attorney-client relationship,[1] the source of that deprivation was action or inaction from within the defense team resulting in Captain Bass' improper withdrawal. Articles 27 and 38, Uniform Code of Military Justice, 10 U.S.C. §§ 827 and 838. Although I agree that the military judge's colloquy with the appellant was insufficient to establish the appellant's express consent to Captain Bass' excusal, I disagree with the majority's con-

---

1. *United States v. DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967).

1. The record includes substantial evidence upon which this court can conclude that "good cause" exists to find Captain Bass' withdrawal proper, including: Captain Bass' voluntary resignation and release from active duty prior to trial; defense knowledge of his approved release date before requesting trial delay past his end of active service (EAS) date without mention of that fact; the appellant's failure to object to Captain Bass' absence though informed of that right by the military judge and Lieutenant Colonel (LtCol) Smith (Record at 449, 454–55, 1949, 2002–03); defense team planning that accounted for Captain Bass' departure; detail of LtCol Cosgrove within three weeks of Captain Bass' departure; defense request and grant of additional delay to provide LtCol Cosgrove preparation time; and the appellant being represented by three counsel virtually throughout the process. *See* RULES FOR COURTS-MARTIAL 505(d)(2)(B)(iii) and 506(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.).

clusion that any assessment of prejudice would be speculative and with the decision to presume prejudice resulting in complete reversal.

Under these facts, we *can* and *should* test for prejudice, fully cognizant of the unique and fundamental nature of the right at issue, and the challenges inherent to that assessment. *See United States v. Acton,* 38 M.J. 330, 336 n. 2 (C.M.A.1993); *see also United States v. Wiechmann,* 67 M.J. 456, 463 (C.A.A.F.2009).

Assuming without deciding that deprivation of the appellant's right to continuation of an established attorney-client relationship constitutes an error "of constitutional dimension," *Wiechmann,* 67 M.J. at 463–64, I am convinced beyond any reasonable doubt that Captain Bass' improper withdrawal did not contribute to the findings of guilt and that "the guilty verdict actually rendered in *this* trial was surely unattributable to [his absence]," *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

However, given Captain Bass' extensive knowledge of the case, probable role in pre-sentencing, and the potential mitigating effect of Dr. Sparr's testimony, I am not convinced beyond a reasonable doubt that his absence did not contribute to the sentence awarded. Therefore, I would affirm the findings approved by the convening authority, but set aside the sentence and authorize a rehearing on sentence.

### Analysis

The majority identifies errors from within and outside the defense team, noting in cases of improper severance by the Government or military judge—we presume prejudice, and where an attorney-client relationship is severed from within, military courts have tested for prejudice. 68 M.J. at 630–31. The majority then presumes prejudice, citing "the significant involvement of parties outside the defense team . . . ." and the challenges inherent to assessing "the actual impact of Captain Bass' departure." *Id.* at 631.

Under these facts, we *can* and *should* test for prejudice. We *should* test for prejudice because the appellant was deprived of his statutory right to continuation of an established attorney-client relationship due to Captain Bass' improper withdrawal, other defense team action or inaction, and because the appellant was represented by three qualified counsel virtually throughout the proceedings.

The deprivation originated with Captain Bass' August 2006 voluntary resignation request and defense motion, seven months later, to delay the trial until after his approved release date without disclosure of that fact. It was perfected when he commenced terminal leave on 25 May 2007 and ceased representing the appellant more than two weeks before the hearing on further defense requested delay, partially due to his "release[ ]." Appellate Exhibit XLIV.

In addition, the defense team either misinformed, or failed to fully inform the appellant of his right to contest Captain Bass' departure. Record at 1949, 2002–03; AE CL at 6–7. They also misinformed the military judge that Captain Bass had been "released" or "relieved" as detailed defense counsel at least three times before and during the 11 June 2007 Article 39a, UCMJ, hearing. AE XLIV; Record at 449, 454–55.

At that hearing the military judge informed the appellant of his right to Captain Bass' presence, but then noted "once [he] leaves active duty, there's no way the Marine Corps can keep him on as your detailed defense counsel." Record at 449, 454–55. The appellant acknowledged understanding his rights, claimed to have discussed this issue with lead and associate counsel "[i]n detail" and then responded that he had no objection to proceeding without Captain Bass. *Id.*

I agree with the majority that this colloquy failed to clarify whether Captain Bass was then on terminal leave, subject to immediate recall, or had been released from active duty, and that the military judge's comments likely further muddled the appellant's understanding of the efficacy of objecting to Captain Bass' absence. I also agree that this colloquy was insufficient to establish the appellant's express consent to Captain Bass' excusal and the military judge's confusing comments render application of the doctrine

of waiver inappropriate. *See United States v. Cutting,* 34 C.M.R. 127, 131, 1964 WL 4979 (C.M.A.1964)("Courts indulge every reasonable presumption against the waiver of fundamental rights").

However, I respectfully disagree that the military judge's incomplete inquiry into the appellant's purported excusal of Captain Bass constitutes "significant involvement" in the loss of his services, somehow converting his improper withdrawal into improper severance by the military judge, and warranting a presumption of prejudice.

In addition, the appellant was represented by three qualified counsel virtually throughout the proceedings including his civilian lead counsel, Mr. J.R. Brannon. Both LtCol Smith and Captain Bass were detailed in the summer of 2006, and LtCol Smith served as associate counsel through trial. After Captain Bass withdrew, LtCol Cosgrove was detailed as his replacement approximately three weeks later, on 15 June 2007, and worked on the case through trial.

Although the military judge and the appellant's supervisory chain of command failed to take appropriate action to prevent the deprivation, as they reasonably could and should have done, the deprivation was not caused by their actions or omissions. Instead, the deprivation was a direct result of Captain Bass' noncompliance with the rules of professional responsibility and Rules for Courts–Martial, Mr. Brannon's and LtCol Smith's misunderstanding of those rules and poor advice to the appellant, and Captain Bass' improper withdrawal. Presuming prejudice, the test applicable to improper severance by the military judge or Government, is, in my view, counter to the interests of justice.

Contrary to the majority's assertion that "we can never rationally assess the actual impact of Capt[ain] Bass' departure," 68 M.J. at 631, I believe we *can* rationally test for prejudice given the record development of specific and general prejudice, weight and credibility of the evidence, and role Captain Bass performed and was expected to perform at trial.

## Specific Prejudice

The appellant alleges specific prejudice on findings including potential loss of a complete defense. The majority notes that Captain Bass was developing a theory of post-traumatic stress disorder with an expert consultant, Dr. Sparr, that Dr. Sparr was ultimately dismissed in favor of an expert with less impressive credentials, and then speculates as to what might have happened had the "PTSD theory been further refined." *Id.* at 631.

The record reflects that the novel defense theory was not a recognized defense in military jurisprudence and was irrelevant to findings. Dr. Sparr concluded that the appellant's symptoms were consistent with chronic PTSD and obsessive-compulsive personality traits, and noted parallels between "battered woman syndrome" and this case. AE LXII at 4–5. He opined the appellant and his squad "believed they had to act proactively to diminish the violence against them which was quite literally a matter of life or death ... that [the appellant] was experiencing significant stress by virtue of [ ] subsequent development of PTSD .... [and] [b]ecause [they were] under pervasive and persistent stress (sic) there was no 'cooling off' period. The heat of passion element is encompassed by anger at the Iraqi's release of [a suspected insurgent] and the subsequent conclusion that one had to kill or be killed." *Id.* at 6.

Doctor Sparr's proposition is not recognized as a special defense in military law, nor does his opinion resemble, even remotely, existing defenses of justification, self-defense, coercion or duress. *See* RULE FOR COURTS-MARTIAL, 916, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.); *see also United States v. Lewis,* 65 M.J. 85, 87 (C.A.A.F.2007)(holding that a military judge required to instruct on special (affirmative) defenses "in issue."). Even assuming this novel theory could possibly qualify as a defense in the killing of a known or suspected insurgent, it is irrelevant here. In this case, in an effort to demonstrate their seriousness, the appellant and Marines under his charge abducted and killed an unidentified man with no suspected insurgent ties because he was a

military-aged male who lived near a suspected insurgent, after their plan to kill a suspected insurgent was compromised.

In addition, lead counsel decided against calling Dr. Sparr after concluding his report, which suggested a novel form of justification, was inconsistent with his theory of the case, and after losing confidence in Dr. Sparr due to perceived inappropriate communications with trial counsel while a defense consultant. Record at 2210–13. I am convinced beyond any reasonable doubt that the absence of further refinement of this novel theory and the decision not to call Dr. Sparr did not contribute to the findings of guilt and that "the guilty verdict actually rendered in *this* trial was surely unattributable to [his absence]." *Wiechmann,* 67 M.J. at 463–64; *see Sullivan,* 508 U.S. at 279, 113 S.Ct. 2078.

### General Prejudice

The appellant also asserts general prejudice in the loss of Captain Bass' expertise on findings and the majority alludes to the speculative nature of assessing the impact of that absence. We need not speculate as Mr. Brannon, with the appellant's consent, made all trial strategy decisions, assigned defense team responsibilities, and testified as to those decisions. Mr. Brannon intended to handle the majority of the merits case with LtCol Smith's assistance. Record at 2201–02, 2208; AE–CXLI. Captain Bass was assigned to work pretrial motions and with Dr. Sparr, and on the presentencing case. *Id.* With the possible exception of examining a few witnesses, and any comments he may have offered, this was the extent of Captain Bass' planned participation on the merits.

Conversely, evidence of the appellant's intent to kill, including his own admissions, is overwhelming. The appellant planned, led, and executed a conspiracy that resulted in the abduction and death of an Iraqi citizen without provocation by that citizen. The plan included the theft and subsequent planting of an AK–47 and shovel to suggest insurgent activity, contingency planning to abduct and kill any nearby military-aged male in the event their efforts to abduct suspected insurgent(s) was compromised, false radio reports, a full-squad assault with automatic weapons on a bound victim, and ended when the appellant shot and killed a severely wounded person, and then submitted false reports intended to justify his killing.

### Conclusion

Under these facts, I am convinced beyond a reasonable doubt that trial on the merits was fundamentally fair. The appellant was availed of his constitutional rights to effective assistance of counsel and counsel of choice, and his statutory right to continuity of counsel with respect to LtCol's Smith and Cosgrove. He was represented by three counsel at virtually all times, their representation was vigorous, consistent with their theory, and the results on findings "might well be characterized as spectacular" given the overwhelming evidence of premeditation. *United States v. Kelly,* 16 M.J. 244, 248 (C.M.A. 1983).

Assuming the appellant was improperly deprived of full exercise of his statutory right to continuation of an established attorney-client relationship with Captain Bass and that this deprivation constituted constitutional error, I am convinced beyond a reasonable doubt that Captain Bass' absence did not contribute to the findings of guilt and that "the guilty verdict actually rendered in *this* trial was surely unattributable to [his absence]." *See Wiechmann,* 67 M.J. at 463–64; *Sullivan,* 508 U.S. at 279, 113 S.Ct. 2078.